J-S35012-22

2024 PA Super 197

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL T. MARTIN, JR. | : | No. 791 MDA 2022 |

Appeal from the Order Entered May 13, 2022
In the Court of Common Pleas of Franklin County Criminal Division at
No(s): CP-28-CR-0002065-2019

BEFORE: BENDER, P.J.E., McLAUGHLIN, J., and STEVENS, P.J.E.[*]

OPINION PER CURIAM: **FILED: SEPTEMBER 5, 2024**

This matter comes before this Court on remand from the Pennsylvania Supreme Court, following its order vacating our June 12, 2023 decision that reversed the trial court's order granting Appellee's motion for a new trial based upon the weight of the evidence, and remanding to us for further review. The Commonwealth has appealed from the trial court's May 13, 2022 order that granted Appellee's post-sentence motions for discharge and, in the alternative, a new trial on weight-of-the-evidence grounds, and vacated the jury's August 31, 2021 verdict finding Appellee guilty of involuntary deviate sexual intercourse with a child ("IDSI") and indecent assault,[1] with prejudice.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 3123(b) and 3126(a)(7), respectively.

Following our careful review, we reverse the trial court's order granting discharge, affirm the grant of a new trial, and remand for further proceedings consistent with this opinion.

An emphasis throughout this matter concerns the timeframe charged by the criminal information and the victim's testimony regarding the frequency of abuse. The information was filed on January 16, 2020 and alleged that the abuse occurred between September 11, 2013 and June 11, 2014. The relevant facts of this matter, as gleaned from the certified record, are as follows:

The victim, J.K., was fifteen-years old at the time of trial and between seven and eight-years old when the abuse occurred. The abuse allegedly occurred throughout the 2013 school year, when J.K. and her family resided with Appellee, her uncle. The Commonwealth called three witnesses at trial: J.K., her mother (hereinafter "E.A."), and Detective David Rush.

E.A. testified that she, her husband, and her seven children (six daughters and one son),[2] had to find housing after their home was condemned. Notes of testimony, 8/31/21 at 29. The family had trouble finding a rental property, leading E.A. to ask her sister, Pamela Martin, if she and her family could temporarily move into her home. Ms. Martin agreed.

---

[2] E.A. and her husband later divorced, following his convictions for sexually abusing two of J.K.'s sisters.

Appellee was married to Ms. Martin, and the couple had one son. The three lived in a three-bedroom home with two floors.[3] The first floor contained a "computer room," a dining room, and kitchen. The dining room had a staircase leading to the second floor, which contained the three bedrooms and the home's only bathroom. Appellee and Ms. Martin slept in one of the bedrooms. *Id.* at 40. One of the other two bedrooms belonged to Appellee's son, and J.K.'s sole brother moved into that room. *Id.* E.A. and her then-husband moved into the third and final bedroom. Two of their daughters were "really small" and thus stayed in that room fulltime. *Id.* at 41. A third daughter would "sometimes" sleep there. *Id.* J.K. and her sister slept downstairs in the room adjoining the computer room, as would the aforementioned child when not sleeping in E.A.'s room. *Id.* at 28, 42.

E.A. testified that the family lived with Appellee for the full 2013 school year. J.K. attended the elementary school, which was within walking distance. The school day was approximately 8:40 a.m. to 3:25 p.m. *Id*. J.K. would leave the home at approximately 8:15 a.m. *Id.* at 48. Of the four adults, only Appellee was employed. *Id.* at 46. On days that Appellee worked, he would leave the home around 1:30 p.m. and return around 11:45 p.m. *Id.* at 48. The parties stipulated to the authenticity of Appellee's work records, which established that he worked Monday through Friday, starting his shift

---

[3] The home had a basement and an attic, but those areas were not used as a living space. Notes of testimony, 8/31/21 at 38.

between 2:15 and 2:30 p.m. *Id.* at 144, 163. Appellee did not work weekends, and he was absent from work during the periods of December 17 through December 31; January 6 to January 31; and March 10 through March 31. *Id.* at 164-65. In total, including weekends, Appellee was not at work for 122 days of the nine months that J.K. and her family resided in his home. *Id.* at 158.

J.K. testified that Appellee would make her perform oral sex on him, "[u]sually in the computer room." *Id.* at 72. Appellee began sexually abusing her "a couple days into it in the first week" after she moved into Appellee's home. *Id.* J.K. testified that nobody else would be present in the room. *Id.* at 73. The other residents would "[s]ometimes … be upstairs and sometimes they would be in the outside of the house in the back yard." *Id.* at 75. J.K. said that the incidents "would usually be in the daytime." *Id.* at 76. On cross-examination, J.K. agreed that in a videotaped statement she said that the abuse happened every day, but clarified that "[i]t happened every other day because sometimes it would be like breaks." *Id.* at 114. The abuse continued until J.K. "said no the one time and then we moved out shortly after." *Id.* at 74.

J.K. disclosed the abuse to her two sisters during a party at their home, years after leaving Appellee's residence. *Id.* at 123. She testified that some of her sisters and their friends told J.K. "to go upstairs because they wanted to talk. … I was so angry because everyone kept leaving me out of stuff, and

it just slipped out because I thought, well, maybe if I said that, then I would actually be included in stuff." *Id.* at 80. The comment that "slipped out" was J.K. saying to the girls, "Well, has anyone ever asked you to suck their dick for candy?" *Id.* At the time, J.K. was unaware that two of her sisters had been molested by their stepfather. *Id.* at 81. The sisters told J.K. that they had been abused and the three girls talked to E.A. *Id.* E.A. then contacted the authorities and the investigation commenced.

The trial court summarized the procedural history of this case as follows:

> [O]n November 16, 2019, in a thirty-minute interview with the same interviewer, J.K. disclosed several incidents of abuse. As a result of her second interview, on November 25, 2019, [Appellee] was charged with one count of [IDSI], a felony of the first degree, and Indecent Assault of a Person Less than 13 Years of Age, a felony of the third degree. The offense date listed for each of these offenses is September 11, 2013, although the Commonwealth acknowledges repeatedly, as discussed below, that this date was set arbitrarily.
>
> After numerous continuances due to the COVID-19 pandemic, [a jury] trial on these charges commenced on August 31, 2021, and [Appellee] was convicted. [Appellee] was sentenced on December 15, 2021, to an aggregate sentence of 75 to 150 months in a State Correctional Institution. That same day, [Appellee] filed three [post-sentence] motions. The first was a Motion for Bail Pending Appeal, which was ultimately denied following a hearing. The second and third, filed together as Post Sentence-Motions Filed on Behalf of [Appellee], included the instant Motion Alleging Verdict was Against the Weight of the Evidence and Motion Alleging Verdict was Against the Sufficiency of the Evidence. Oral argument on the instant Motions occurred on February 2, 2022, after which we Ordered the parties to submit briefs. [Appellee] timely

submitted his brief on February 11, 2022. The Commonwealth untimely submitted their brief on March 11, 2022, nine (9) days after their deadline set by Order of Court dated February 2, 2022.

On April 6, 2022, [Appellee] filed a Motion Requesting Order of Court Granting Court Extension of Time, requesting that we grant ourselves an additional thirty (30) days to render a decision for good cause[….] We found good cause to have been shown because we had only twenty-four (24) weekdays to render a decision following the filing of the Commonwealth's brief, which was not sufficient time due to the nature of the Court's calendar. Therefore, we granted the Motion, extending our deadline to May 14, 2022.

Trial court opinion, 5/13/22 at 2-3 (footnotes, internal citations, and emphasis omitted).

On May 13, 2022, the trial court entered a comprehensive opinion and order granting Appellee's post-sentence motions. Within this opinion and order, the trial court found the weight and sufficiency of the evidence did not support Appellee's convictions for IDSI and indecent assault. Therefore, the trial court vacated the jury's verdict with prejudice.

Specifically, the trial court reasoned that "the Commonwealth failed to meet its burden to prove a continuing course of conduct in a case involving the abuse of a young child pursuant to [**Commonwealth v. Jette**, 818 A.2d 533 (Pa.Super. 2003), **appeal denied**, 833 A.2d 141 (Pa. 2003)]." Trial court opinion, 5/13/22 at 1. Alternatively, "even if the Commonwealth had proven a continuing course of conduct," the court concluded that the Commonwealth was not entitled to "'the broad leeway' afforded to them in setting the

approximate time and place[.]" *Id.* Finally, "even if the Commonwealth had proceeded at trial under a theory pursuant to [*Commonwealth v. Groff*, 548 A.2d 1237 (Pa.Super. 1988)]," the trial court determined that the Commonwealth failed to meet its burden to provide corroborating evidence. Trial court opinion, 5/13/22 at 1.

The trial court further concluded that a new trial was warranted based on the weight of the evidence, and opined that Appellee is innocent. *Id.* at 36. As the standard of review for a weight claim does not require reviewing the evidence in the light most favorable to the Commonwealth, the trial court cited numerous points that warranted granting Appellee a new trial in relation to the credibility of J.K.'s theory. As discussed in the sufficiency analysis, the trial court was convinced that J.K. was untruthful with respect to the frequency of abuse. The trial court disagreed with Appellee's characterization of J.K. as a liar "as it implies some level of malice on J.K.'s part." *Id.* at 39. The trial court then examined "several plausible theories" it deemed supported by the record to explain J.K.'s testimony. First, the trial court expressed regret at sustaining an objection by Appellee to the Commonwealth's question to J.K. regarding the circumstances of her two interviews with the Children's Advocacy Center. During the first interview, J.K. did not disclose any abuse. J.K. disclosed the abuse at the second interview, which was scheduled by E.A. without J.K.'s knowledge. The trial court concluded that sustaining the

objection "suggested to the jury that [E.A.] had 'made' J.K. go" to the interview. *Id.* at 42.

Next, the trial court recognized mental issues testified to by J.K., which included a ten-day stay in a psychiatric facility after cutting herself with a razor blade. Notes of testimony, 8/31/21 at 86. The trial court concluded that she may have "created a villain in her own mind[.]" Trial court opinion, 5/13/22 at 43. The trial court recognized that this observation could be interpreted as a challenge to the fitness of J.K.'s family but concluded that this "villain" theory was a viable "possibility" due to the fact that J.K.'s sisters were sexually abused, and therefore her family members would be less likely to "question the veracity of her disclosures[.]" *Id.* Relatedly, the trial court was persuaded by defense counsel's suggestion that "J.K. had essentially become entangled in a web of lies that had started with the unusual circumstances of her disclosure." *Id.* The trial court agreed, as J.K. candidly testified that she wanted to "fit in" with her sisters. In turn, it was only natural for her sisters to support J.K. However, "*if* J.K.'s disclosure to her sisters was indeed untruthful, then J.K. suddenly had to provide a lie to her mother." *Id.* at 44 (emphasis in original). The trial court deemed this significant as it related to J.K.'s first interview with the Children's Advocacy Center. While J.K. testified that she did not reveal the abuse at the first interview due to embarrassment, in the trial court's view the fact that her sisters had went through that process

with the support of her mother made it more likely that J.K. would have been forthright about any abuse that may have happened.

The trial court also authored a section of the opinion titled "impermissible shifting of the burden upon defendant," *id.* at 45 (capitalization omitted), which discussed other circumstances that troubled the trial judge. First, J.K.'s answers that the abuse happened when she was either seven, eight, or "maybe eleven[,]" gave the trial court pause because this was not an instance where the disclosure of abuse happened decades after the fact. Second, J.K. initially claimed that the abuse occurred on a daily basis starting from the first weekend J.K. and her family moved into Appellee's home. The trial court characterized the Commonwealth's evidence as establishing only that "[Appellee] and J.K. lived in the same house." *Id.* at 47. The trial court believed that the Commonwealth's testimony of Detective Rush and his calculations that the abuse could have occurred on the 122 days that Appellee did not work acted to shift the burden to Appellee to prove his innocence.

Finally, the trial court concluded in its final section, titled "[Appellee]'s inability to meaningfully raise an alibi defense," *id.* (capitalization omitted), that this "one specific issue … shocks our conscience the most," even more than its "own belief in [Appellee]'s innocence[.]" *Id.* at 48. The trial court was concerned that Appellee was required "to provide his whereabouts for every minute of every day across a nine-month period." *Id.* This "resulted

in [Appellee] being presented to the jury as a guilty man trying to prove his innocence." *Id.*

The Commonwealth filed a timely notice of appeal on May 20, 2022. On May 25, 2022, the trial court ordered the Commonwealth to file a concise statement of errors complained of on appeal, in accordance with Pa.R.A.P. 1925(b). The Commonwealth filed its timely Rule 1925(b) statement on June 13, 2022. On June 15, 2022, the trial court filed a Rule 1925(a) opinion, incorporating the analysis in the opinion authored in support of its May 13, 2022 order granting Appellee's post-sentence motions.

Thereafter, on July 21, 2022, Appellee filed a motion seeking to either quash the Commonwealth's appeal or find the issues waived due to the Commonwealth's purported failure to comply with Rule 1925(b). On August 2, 2022, the Commonwealth filed a response. On September 29, 2022, Appellee's motion to quash was denied by *per curiam* order of this Court.

As discussed, this Court issued an opinion on June 12, 2023 that reversed the trial court's May 13, 2022 order granting Appellee's motion for a new trial based upon the weight of the evidence, and remanded this case to the trial court with instructions to enter an order reinstating the jury's guilty verdict and re-committing Appellee to serve the balance of his sentence. Thereafter, on April 23, 2024, our Supreme Court entered an order vacating this Court's decision and remanding this matter to this Court for further review

of "the challenge to the trial court's order under the appropriate appellate standard of review." **Per Curiam** order, 4/23/24.

Accordingly, we revisit the issues the Commonwealth has raised on appeal:

> 1. Whether the trial court erred when it granted [Appellee's] post-sentence motions on the basis that the Commonwealth failed to present sufficient evidence at trial to warrant the jury's verdict of guilty to one count each of [IDSI] and indecent assault of a person less than 13 years of age?
>
> 2. Whether the trial court erred when it granted [Appellee's] post-sentence motions on the basis that the jury's verdict was against the weight of the evidence?

Commonwealth's Brief at 4 (extraneous capitalization omitted).

Prior to addressing the merits of the Commonwealth's claims, we must first address Appellee's contention that the May 13, 2022 order is unappealable because it risks subjecting him to retrial in violation of double jeopardy principles. Appellee's brief at 7-9.

It is well settled that "the Double Jeopardy Clause bars retrial following a court-decreed acquittal, even if the acquittal is based upon an egregiously erroneous foundation." **Evans v. Michigan**, 568 U.S. 313, 318 (2013) (citation and internal quotation marks omitted). The same is not true when a trial court grants a motion for discharge after the jury has convicted. The difference is the latter scenario does not involve an acquittal, and thus no retrial will occur. Thus, a ruling in favor of the Commonwealth on appeal

merely restores the jury's verdict. **See id.** at 330, n.9 (stating, "[i]f a court grants a motion to acquit after the jury has convicted, there is no double jeopardy barrier to an appeal by the government from the court's acquittal, because reversal would result in reinstatement of the jury verdict of guilt, not a new trial."). This Court has recognized that "[t]he law in Pennsylvania is consistent with the federal decisions." **Commonwealth v. Feathers**, 660 A.2d 90, 94 (Pa.Super. 1995) (**en banc**), **affirmed**, 683 A.2d 289 (Pa. 1996).

Appellee's argument that the May 13, 2022 order is not appealable is confusing; the bulk of his argument discusses the "critical distinction between challenges to the weight of the evidence and the sufficiency of the evidence." Appellee's Brief at 7. Appellee quotes caselaw holding that claims "challenging the sufficiency of the evidence, if granted, would preclude retrial under the double jeopardy provisions of the Fifth Amendment to the United States Constitution[.]" **Id.** at 7-8; **Commonwealth v. Widmer**, 744 A.2d 745, 751 (Pa. 2000). Appellee misapprehends the relevance of these observations. The quoted portion of **Widmer** merely discusses what happens if an appellate court determines and/or agrees with a trial court that the evidence was insufficient to convict. In that case, retrial is barred. But here the question is simply whether the trial court was correct that the jury's verdict is unsupported by sufficient evidence. Because Appellee was not acquitted, the order is appealable. We now turn to the Commonwealth's claims on appeal, which can be divided into three distinct subsections.

**I.**

The Commonwealth first argues that in assessing the sufficiency of the evidence, the trial court improperly engaged in a *sua sponte* examination of the legal issues discussed in **Commonwealth v. Devlin**, 333 A.2d 888 (Pa. 1975) and its progeny. Commonwealth's brief at 15. The Commonwealth avers that Appellee's post-sentence motions did not in any way challenge that aspect of the Commonwealth's case. *Id.*

In the instant matter, the trial court's sufficiency analysis focused primarily on three cases: **Devlin**, *supra*; **Groff**, *supra*; and **Jette**, *supra*. **Devlin** involved a victim who "had the mental ability of a first or second grade child and the emotional stability of an even younger child." **Devlin**, 333 A.2d at 889. In **Devlin**, the victim stated that Devlin had sexually assaulted him on one occasion but could not place the date. Other evidence suggested that if the act occurred it would have been over a fourteen-month period. The **Devlin** court held that Devlin's due process rights were violated and ordered discharge.

**Groff** involved a seven-year-old child testifying to multiple sexual crimes that all occurred "on only one occasion." **Groff**, 548 A.2d at 1239. Applying **Devlin**, the **Groff** Court held that the Commonwealth "should … come forward with any evidence which indicates when the alleged crime is most likely to have taken place." *Id.* at 1241. The **Groff** Court further

concluded that Groff's due process rights were not violated because the Commonwealth presented other evidence narrowing the timeframe down to a three-month period.

Finally, in *Jette*, the appellant was convicted of, *inter alia*, one count of IDSI. The victim, who was eight-years old at the time of the incidents, testified to a continuing course of sexual abuse, detailing "four of the worst incidents, [and] describing generally when they occurred by month and generally what time of the year." *Jette*, 818 A.2d at 535. The *Jette* Court affirmed the convictions, concluding that the Commonwealth "must be afforded broad latitude when attempting to fix the date of offenses which involve a continuous course of criminal conduct." *Id.*, quoting *Groff*, 548 A.2d at 1242.

Here, the trial court found that "the Commonwealth failed to meet its burden to prove a continuing course of conduct in a case involving the abuse of a young child pursuant to [*Jette*]." Trial court opinion, 5/13/22 at 1. Alternatively, "even if the Commonwealth had proven a continuing course of conduct," the trial court concluded that the Commonwealth was not entitled to "'the broad leeway' afforded to them in setting the approximate time and place[.]" *Id.* Finally, "even if the Commonwealth had proceeded at trial under a theory pursuant to [*Groff*]," the trial court determined that the Commonwealth failed to meet its burden to provide corroborating evidence. *Id.*

Following our careful review, we agree with the Commonwealth's contention that the trial court erred by engaging in a ***sua sponte*** examination of legal issues that were not raised by Appellee. We begin our analysis of this issue by quoting Appellee's post-sentence motion for relief:

> 6.     [Appellee] alleges that the verdict was against the sufficiency of the evidence.
>
> 7.     The law related to said claim is as follows:
>
>     a)  It is appropriate for the trial court to determine if the evidence presented at trial was sufficient to support the verdict. ***Commonwealth v. Martin***, [101 A. 3d 706 (Pa. 2019)].
>
>     b)  The court must review the evidence in the aggregate in order to determine the propriety of the Defendant's motion. In ***Interest of J.B.***, [189 A.3d 390 (Pa. 2013)].

Post-Sentence Motions, 12/15/21 at unnumbered 2-3 (citation formatting amended).

Appellee's motion then cited a series of facts in paragraph eight, all of which may fairly be summarized as attacking the plausibility of J.K.'s testimony. The motion concluded:

> 9.     Applying the law and facts, as set forth above, warrant[s] relief for [Appellee]. It is clearly evident that the evidence against the defendant was "tenuous," "vague," and "uncertain[,]" ***Commonwealth v. Talbert***, [129 A.3d 536 (Pa.Super. 2015)], and [the verdict] was so contrary to the evidence as to sho[ck] one's sense of justice. ***Commonwealth v. Morales***, [91 A.2d 80 (Pa. 2014)]. It is imperative that

- 15 -

the [c]ourt enter a directed verdict or one of acquittal [sic] so that right may be given another opportunity to prevail. ***Commonwealth v. Antidormi***, [84 A.3d 736 (Pa.Super. 2014)]. To fail to do such would be to deny justice. ***Commonwealth v. Green***, [204 A.3d 469 (Pa.Super. 2019)]; ***Commonwealth v. Williams***, [176 A.3d 298 (Pa.Super. 2017)]; ***Commonwealth v. Miller***, [172 A.3d 632 (Pa.Super. 2017)].

Post-Sentence Motions, 12/15/21 at unnumbered 6 (citation formatting amended).

While styled as a sufficiency claim, both the facts cited in support of Appellee's claim and the law in support largely attack the weight of the evidence. An argument that goes purely to weight, even if styled as sufficiency, necessarily fails. ***See Commonwealth v. Small***, 741 A.2d 666, 672 (Pa. 1999) (stating, "[a]lthough [the] appellant phrases this as a sufficiency argument, the challenge goes to the weight of the evidence. Accordingly, [the] appellant's challenge to the sufficiency of the evidence must fail." (citation omitted)), ***cert. denied***, 531 U.S. 829 (2000). That Appellee's complaints went to the weight is evident from the citations in the ninth paragraph of his post-sentence motions. The complete sentence Appellee cited from ***Talbert*** states, "[i]n order for a defendant to prevail on a challenge to the weight of the evidence, 'the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court.'" ***Talbert***, 129 A.3d at 546 (emphasis added). Similarly, the ***Antidormi*** citation discusses

- 16 -

the relief applicable to a successful weight challenge, a retrial, whereas the remedy for a successful challenge on sufficiency grounds is discharge.

Even though Appellee raised, at best, only a generic sufficiency of evidence claim without reference to any element(s) of the crime, the trial court's analysis had almost nothing to do with whether the evidence would enable a rational fact-finder to convict. The "**Devlin** claim" explored by the trial court does have a connection to a general sufficiency of the evidence challenge in that both are grounded in due process. However, their commonality ends there, as **Devlin** is about the fundamental right to present a defense.

The United States Supreme Court held in **Jackson v. Virginia**, 443 U.S. 307 (1979), that the Due Process Clause as incorporated by the Fourteenth Amendment requires that all convictions be supported by "sufficient proof — defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." **Id.** at 316. We follow that approach, as stated in **Commonwealth v. Brown**, 52 A.3d 1139 (Pa. 2012):

> First, our standard of review, like the **Jackson** standard, recognizes the proper regard an appellate court must give to the fact-finder's evaluation of all of the evidence received at trial and, therefore, requires scrutiny of the totality of that evidence in the light most favorable to the Commonwealth, as verdict winner, and to draw all reasonable inferences in favor of the Commonwealth. Further, our Court's determination of the ultimate question of evidentiary sufficiency parallels the central inquiry under the

> *Jackson* standard, namely, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Id.* at 1164 (citations, internal quotation marks, and footnote omitted).

The *Jackson* decision protects due process in a particular way: it operates as a check on the quality of the government's evidence in proving the crimes. Separately, due process requires that the Commonwealth give fair notice in the charging instrument. "In criminal … matters, the United States Supreme Court has discerned a due process requirement that alleged misconduct must be identified with particularity in the essential notice conferred." *In re R.M.*, 790 A.2d 300, 305 (Pa. 2002). The criminal information "sets the stage for trial and what the Commonwealth intends to prove." *Commonwealth v. King*, 234 A.3d 549, 563 (Pa. 2020). This implicates basic due process protections. "No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal." *Cole v. Arkansas*, 333 U.S. 196, 201 (1948). These due process protections are linked to the due process protections encompassed by a sufficiency-of-the-evidence claim. The charging document puts the defendant on notice of what the Commonwealth intends to prove, and, in turn, the evidence presented at trial must be of sufficient quality to

enable a rational fact-finder to conclude that the Commonwealth has proved the crimes specified within the information beyond a reasonable doubt.

The trial court addressed the fact that the criminal information encompassed a nine-month period of time and opined that this "shifted the burden" to the defense. "It is ... beyond cavil that it is the Commonwealth's burden to prove guilt, rather than the defendant's duty to establish innocence." *Commonwealth v. Kennedy*, 453 A.2d 927, 929 n.2 (Pa. 1982). The *Devlin* Court recognized that, under the circumstances of a particular case, a defendant's due process right to present a defense may be violated, but that does not shift the burden to the defendant. *Devlin*, 333 A.2d at 891 (stating, "[t]he State Constitution is violated where the defendant is substantially denied an opportunity to present a defense.") (citation omitted); *see also Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (stating, "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'") (citation omitted). The trial court's belief that the Commonwealth "shifted tactics" midtrial is more accurately described as a potential due process violation relating to the validity of "variances" between the information and the evidence presented at trial. *See*, *e.g.*, *Berger v. United States*, 295 U.S. 78, 82 (1935) (stating, "[t]he true inquiry … is not whether there has

been a variance in proof, but whether there has been such a variance as to 'affect the substantial rights' of the accused.").

Instantly, we agree with the Commonwealth that the issues raised by Appellee in his post-sentence motion cannot be interpreted as a claim that he was denied an opportunity to present a defense. Moreover, our assessment that the legal theory explored in *Devlin* and its progeny is a distinct due process claim is corroborated by the fact those cases suggested that a defendant must preserve and raise that specific issue. The *Devlin* opinion makes clear that the appellant therein explicitly cited the inability to raise a defense, not that the evidence was insufficient to convict: "At the close of the Commonwealth's case, the defense demurred to the prosecution's evidence on the ground that the Commonwealth had not fixed the date of the crime with sufficient particularity, and thus the charge was impossible to defend." *Devlin*, 333 A.2d at 890.

Likewise, in *Jette*, the appellant therein clearly raised that specific theory: "Jette does not argue that the Commonwealth failed to prove any element of the crimes of which he was convicted. Instead, [the a]ppellant argues that the evidence was insufficient to support his conviction because the victim's testimony was not sufficiently specific regarding the dates of the incidents of abuse." *Jette*, 818 A.2d at 534. It also bears noting that the *Devlin* Court emphasized that the due process inquiry must be analyzed with reference to the specific facts of the case. *Devlin*, 333 A.2d at 892 (stating,

"[h]ere, as elsewhere, '[t]he pattern of due process is picked out in the facts and circumstances of each case.'" (citation omitted)). The Commonwealth's contention that the trial court exceeded its authority thus has substantial force, as the trial court determined *sua sponte* that Appellee's due process rights were violated under the facts of the case without the benefit of adversarial positions by the parties.

We express no opinion on whether the trial court's theory is meritorious. The trial court attempted to answer whether the convictions for two counts could stand, accepting that J.K.'s testimony was sufficient to meet the elements of the charged crimes for a subset of the entire timeframe charged. We need only determine that Appellee did not make that claim. Instead, he claimed that J.K. was not credible in total. Thus, whether a "variance" was justifiable under these circumstances or whether Appellee's ability to offer a defense was hampered were issues not raised by Appellee. Accordingly, we agree with the Commonwealth's first argument that the trial court improperly addressed issues that were not raised in Appellee's post-sentence motions.

## II.

The Commonwealth next contends that the trial court erred in granting Appellee's post-sentence motions on the basis that the Commonwealth failed

to present sufficient evidence to support Appellee's convictions for IDSI and indecent assault. Commonwealth's brief at 12, 25.[4]

> In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to prove every element of the offense beyond a reasonable doubt. As an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder. Any question of doubt is for the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances.

*Commonwealth v. Thomas*, 988 A.2d 669, 670 (Pa.Super. 2009) (citations omitted), *appeal denied*, 4 A.3d 1054 (Pa. 2010).

A person will be found guilty of IDSI "when the person engages in deviate sexual intercourse with a complainant who is less than 13 years of age." 18 Pa.C.S.A. § 3123(b). "Deviate sexual intercourse" is defined as "[s]exual intercourse per os or per anus…. The term also includes penetration, however slight, of the genitals or anus of another person with a foreign object for any purpose other than good faith medical, hygienic or law enforcement procedures." 18 Pa.C.S.A. § 3101.

---

[4] We note that the trial court did not address this garden variety sufficiency-of-evidence claim. Because Appellee prevailed below and we can affirm on any basis, *see Commonwealth v. O'Drain*, 829 A.2d 316, 322 n.7 (Pa.Super. 2003), however, we must address the actual claim raised by Appellee in his post-sentence motion.

Additionally, "[a] person is guilty of indecent assault if the person has indecent contact with the complainant … for the purpose of arousing sexual desire in the person or the complainant and … the complainant is less than 13 years of age[.]" 18 Pa.C.S.A. § 3126(a)(7). Indecent contact is defined as "[a]ny touching of the sexual or other intimate parts of the person for the purpose of arousing or gratifying sexual desire, in any person." 18 Pa.C.S.A. § 3101.

Viewing the evidence in the light most favorable to the Commonwealth, the verdict winner, we find there was ample evidence to sustain Appellee's convictions for IDSI and indecent assault of a person less than thirteen years of age. At trial, the Commonwealth called three witnesses: J.K.; J.K.'s mother, E.A.; and Detective David Rush. The record reflects that J.K., who was fifteen-years old at the time of trial, testified that Appellee would make her perform oral sex on him, "[u]sually in the computer room." Notes of testimony, 8/31/21 at 72-75. J.K. testified that Appellee began sexually abusing her "a couple days into it in the first week" after she and her family moved into his home during the 2013 school year. *Id.* J.K. was between seven and eight-years old when these incidents took place. *Id.* at 25, 91. J.K. further testified that no one else was present in the room when these incidents took place, but the other residents of the household would "[s]ometimes … be upstairs and sometimes they would be in the outside of

- 23 -

the house in the back yard." *Id.* at 73, 75. J.K. also stated that the incidents "would usually be in the daytime." *Id.* at 76.

On cross-examination, J.K. agreed that in a videotaped statement she said that the abuse happened every day, but clarified that "[i]t happened every other day because sometimes it would be like breaks." *Id.* at 114. J.K. testified that the abuse continued until she "said 'no' the one time and then we moved out shortly after." *Id.* at 74. J.K. further testified that she disclosed the abuse to her two sisters a few years after leaving Appellee's residence. *Id.* at 123. J.K. and her sisters then told E.A., who subsequently contacted the authorities and an investigation commenced. *Id.* at 81.

This Court has long recognized that the testimony of the complainant standing alone is sufficient to convict. "[A] solitary witness's testimony *may* establish every element of a crime, assuming that it speaks to each element, directly and/or by rational inference." *Commonwealth v. Johnson*, 180 A.3d 474, 479 (Pa.Super. 2018) (emphasis in original), *appeal denied*, 205 A.3d 315 (Pa. 2019). Here, the record reflects that J.K.'s testimony that Appellee's genitals contacted her mouth is sufficient to meet the elements of IDSI. *See, e.g., Commonwealth v. Wilson*, 825 A.2d 710, 714 (Pa.Super. 2003) (stating, "[b]ecause there was oral contact with the [a]ppellant's genitalia and the victim's mouth, we find the evidence is sufficient to establish penetration however slight."). Likewise, the same testimony meets the definition of indecent assault under Section 3126(a)(7), as it was undisputed

that J.K. was under 13 at the time of these crimes. Accordingly, J.K.'s testimony that she and Appellee had oral sex on multiple occasions, if believed by the jury, was sufficient to establish both crimes.

The trial court concluded that J.K.'s testimony presented a "conundrum" because she stated, when confronted with a prior statement, that the abuse occurred every day, that it occurred every other day. Trial court opinion, 5/13/22 at 23-26. The trial court determined that this was extremely unlikely when measured against Appellee's stipulated work records. *Id.* The core problem with the trial court's analysis is that it appeared to consider the jury's ability to weigh evidence as constituting an all-or-nothing proposition. The "conundrum" presented by J.K.'s testimony that the abuse occurred every other day and the stipulation to Appellee's work records is resolvable by concluding that a rational fact-finder could reject parts of J.K.'s testimony while accepting others. The jury could credit J.K.'s testimony that Appellee serially abused her, but not at the frequency claimed. The jury was not required to fully credit J.K.'s testimony in all respects for the conviction to be valid. The jury could have, for example, rationally concluded that J.K. was so traumatized by multiple incidents of abuse that she recalled it happening more often than it did.

The jury was not required to fully credit that aspect of J.K.'s testimony to uphold this conviction. A rational fact-finder could conclude that Appellee

repeatedly abused J.K. while simultaneously concluding that it did not occur as often as J.K. stated.

The United States Supreme Court has held that "[s]ufficiency review essentially addresses whether the government's case was so lacking that it should not have even been submitted to the jury." *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (citation and internal quotation marks omitted). If a jury "was convinced, … the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 566 U.S. 650, 656 (2012). We conclude that it does not in the case *sub judice*, and therefore reverse the trial court's order discharging Appellee on the basis there was insufficient evidence to sustain the jury's verdict.

Finally, we note that the trial court did not address Appellee's substantive argument regarding the plausibility of J.K.'s testimony. Fairly read, Appellee's post-sentence motion argued that the testimony was so unreliable that a conviction cannot stand. While not cited by Appellee, we find our Supreme Court's decision in *Commonwealth v. Karkaria*, 625 A.2d 1167 (Pa. 1993), to be instructive. That case involved allegations of forcible rape over a long period of time and under unusual factual circumstances. The Court discharged Karkaria on sufficiency grounds, as "where evidence offered to support a verdict of guilt is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, a jury may not be permitted to return

such a finding." **Id.** at 1170 (quoting **Commonwealth v. Smith**, 467 A.2d 1120, 1122 (Pa. 1983)).

The Commonwealth's case in that matter "rested upon the testimony of the complainant, Sidney F., who was 14 years of age at the time of the trial." **Id.** at 1168. Sidney testified that in 1981, her mother married the appellant's father, and the family moved in together in her stepfather's home. **Id.** Sidney, who was eight-years old at that time, testified that the appellant, who was 16, began babysitting her as well as her brother and stepbrother (Andre and Davin), both of whom were ten. The **Karkaria** Court summarized the victim's testimony as follows:

> Mother and stepfather had a moderate social schedule. Sidney testified that she had no recollection of her mother and stepfather going out together on any evenings during the week. She testified that they had season tickets to the Pittsburgh Symphony for the Friday evening performances, and occasionally went out to dinner or to a movie on a weekend evening. It was during these social outings of the parents that Sidney claims to have been sexually assaulted on a regular basis by [the appellant], beginning in 1981, approximately three years prior to the initial date charged in the indictment.
>
> According to Sidney's testimony, the sexual encounters occurred on a regular weekly basis for over three years and occurred in exactly the same manner on each occasion. She testified that the assaults always occurred on a weekend evening when her parents were out and [the appellant] was babysitting. She stated that Andre was never present in the home when the assaults occurred. Sidney did testify that Davin was present but that he was never aware of what was transpiring between [the appellant] and her. Davin did not testify. Sidney

- 27 -

testified that on each occasion that she was assaulted, [the appellant] carried her out of the room where the "children" were playing or watching TV to another part of the house and removed her clothing, and that no words were ever spoken between she and [the appellant] during the assaults. Sidney also testified that she never experienced any pain during the sexual assaults, and that she never cried out during the assaults or complained to anyone about what was occurring between [the appellant] and her. Further, she never objected to being left in [the appellant's] care when her mother went out, and her relationship to [the appellant], was in all other respects, uneventful. Although Sidney did testify at the time of trial that she was afraid of [the appellant] and his father, she testified that she did not have that fear at the time the assaults were supposedly taking place.

*Id.* at 1168 (footnotes omitted).

After reviewing additional evidence and inferences in the light most favorable to the Commonwealth, the *Karkaria* Court stated:

In order for the jury in this case to have concluded that Sidney was forcibly raped by [the appellant], the jury would have had to conclude that the child had been forced to submit to sexual intercourse at least once between April 9, 1984[,] and September 19, 1984. Since there was no direct evidence of sexual intercourse between those dates, the jury in order to convict, would have had to conclude, beyond a reasonable doubt, that the child had been forced to submit to sexual intercourse over 300 times, without ever feeling pain, without any physical evidence to support the contention that she was so victimized, and without any specific recollection by Sidney as to a date certain upon which even one of the several hundred assaults occurred.

*Id.* at 1170–1171.

Taking all evidence in the light most favorable to the Commonwealth, "the record is riddled with critical inconsistencies." *Id.* at 1171. Sidney reported the crimes to the District Attorney, who declined to prosecute "because Sidney was unable to offer sufficient testimony as to the material elements of the crime of rape." *Id.* In her initial report to the police, Sidney did not recall having been penetrated. *Id.* Moreover, those police reports "coincide precisely with the pending reconciliation of her mother and stepfather. This fact is important in light of Sidney's repeated expressions of hatred for her stepfather." *Id.* And Sidney's testimony "as to when any particular act of rape occurred is disturbingly vague." *Id.* "The most striking inadequacy in the Commonwealth's case however, is the fact that Sidney insisted that the assaults only occurred when [the appellant] was babysitting and yet she also admitted that during the time period charged in the indictment (April through September 1984), [the appellant] no longer acted as the babysitter." *Id.*

We do not find that J.K.'s testimony was so incredibly unreliable that the verdict was predicated only on conjecture. Certainly, the facts are unusual in that so many people were present in a small home and may have known of the abuse. But this discounts the sad possibility that, for whatever reason, these witnesses turned a blind eye to J.K.'s predicament. In this regard, one of the facts pointed to by Appellee in his post-sentence motion was the fact that J.K.'s sisters were abused. "A now-convicted child abuse [*sic*] lived with

the child during the abuse she alleged occurred by [*sic*] [Appellee]. Said man abused other children in the home. Said man did not work and was home with the subject child whenever she was home." Post-Sentence Motions, 12/15/21 at unnumbered 5. This suggests that if J.K. was abused it was, like her sisters, by her stepfather. Obviously, that would exonerate Appellee. But the fact that abuse goes on in the secrecy of a home demonstrates that abuse can happen, with family members either unaware of the acts or refusing to confront reality due to fear or something else. In fact, J.K. testified that Appellee's wife entered the room when Appellee was performing oral sex on J.K., and that Appellee's wife did nothing. Notes of testimony, 8/31/21 at 79 ("She just told me to go in the kitchen … no one said anything to me about anything after that.").

We also note that E.A. testified that J.K. smeared feces on the wall at one point during their stay with Appellee, which offers some degree of contemporaneous corroboration that something was occurring in the home. *Id.* at 33. We therefore conclude that this case does not involve a scenario where the testimony described incidents that were simply impossible or that the testimony was so unreliable that the verdict was based on pure speculation. Nor is there an identifiable motive for J.K. to lie as was the case in *Karkaria*. Thus, taken together, this is not a case where the evidence was so entirely unreliable that the conviction cannot stand.

# III.

In its final claim, the Commonwealth argues that the trial court abused its discretion in granting Appellee's post-sentence motion on the basis that the jury's verdict was not supported by the weight of the evidence. Commonwealth's brief at 30. Upon review, we disagree with the Commonwealth that the trial court abused its discretion in granting a new trial.

Our standard of review of a weight of the evidence claim is as follows:

> A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

**Widmer**, 744 A.2d at 751–752 (footnote, citations and internal quotation marks omitted). On appeal, our review is "distinct from the standard of review applied by the trial court[.]" **Commonwealth v. Clay**, 64 A.3d 1049, 1055 (Pa. 2013). We do not review the underlying weight of the evidence question.

Instead, we examine the judge's exercise of discretion in ruling on that claim. *Id.*

The Commonwealth asserts that the trial court violated these precepts, which exist to "prevent the Monday morning quarterbacking in which the trial court engaged during this case." Commonwealth's Brief at 37. The Commonwealth argues that the trial court simply acted as the thirteenth juror, disregarded the jury's judgment, and substituted its own. *Id.* at 32. While the trial court's opinion recognizes it cannot do that, the Commonwealth argues that the substance of the trial court's analysis demonstrates it did so. "The trial court goes to great lengths to frame its analysis in a way [that] does not equate to the trial court attempting to function as the thirteenth juror in this case, but the trial court's opinion does not bear out this assertion." *Id.* The Commonwealth notes that the trial court's opinion discusses alternative theories to explain J.K.'s inconsistent testimony, with the court "substitut[ing] the factual and credibility determinations of a jury of twelve of [Appellee]'s peers[, and] did so by relying upon a series of speculative conclusions that have absolutely no basis in the record." *Id.* at 36. In this regard, the Commonwealth cites the trial court's admission that it "began its weight[-]of[-]the[-]evidence analysis months before such an issue was even before the court." *Id.* at 37 (emphasis omitted). The Commonwealth also characterizes large portions of the trial court's opinion as "read[ing] more like a collateral

post-conviction petition for relief blindly alleging ineffective assistance of trial counsel than a judicial opinion." *Id.* at 35.

The trial court clearly does not believe J.K., given its conclusion that Appellee is innocent. However, we disagree with the Commonwealth that the trial court's assessment amounted to functioning as the thirteenth juror. The first reference to the concept of a "thirteenth juror" appeared in ***Austin v. Ridge***, 255 A.2d 123 (Pa. 1969), which noted "the central problem" in addressing weight challenges: the degree of freedom that should be afforded a trial court "to review and set aside a jury verdict where the evidence presented to the jury is legally sufficient to sustain that verdict[.]" *Id.* at 124-125. The ***Ridge*** Court explained that some jurisdictions explicitly permit a court to act "as a thirteenth juror" while others "restrict the discretion of the trial court to ordering a new trial only where, on the evidence presented to it, a jury could not reasonably have reached its verdict." *Id.* at 125. The ***Ridge*** Court described Pennsylvania law as adopting "an intermediate position," which it described as follows:

> [A] trial judge abuses his discretion when he grants a new trial merely because he would have arrived at a different conclusion on the facts of the case than that reached by the jury. Where, however, the trial court is convinced that the verdict is against the clear weight of the evidence or that the judicial process has effected a serious injustice, he is under a duty to grant a new trial. Our rule may be simply stated; its content is more elusive; and its application will of course require a continuing exercise of judicial sensitivity. The burden of the approach outlined is to treat the legitimacy of the trial court's grant of a new trial as a

> function of the seriousness of the jury's departure from that result which the trial court feels is dictated by the evidence. Where the case is close and the evidence contradictory, the jury must perforce be given freer rein; but a new trial should be granted and will be upheld where the jury verdict is so opposed to the facts that the judicial conscience cannot let the result stand.

*Id.* (internal citations omitted).

After careful review of the trial court's comprehensive opinion, we agree that it did not abuse its discretion in concluding that this was one of the exceedingly rare cases in which a new trial is required to give justice a chance to prevail. We agree that the Commonwealth presented sufficient evidence to sustain the verdict, but we find no abuse of discretion in the trial court's explanation of why the verdict shocked its conscience. We find that the court's discussion of all the alternative theories for J.K.'s testimony reflects its "fervent belief" that a grave injustice occurred.[5] *See* trial court opinion, 5/13/22 at 37.

---

[5] We agree with the Commonwealth that portions of the trial court's opinion inappropriately discuss potential ineffective assistance of counsel claims. For example, the trial court's observation that a new trial was likely warranted based on an erroneous sustainment of a hearsay objection concerning what E.A. told J.K. prior to J.K. conducting her second interview with the Children's Advocacy Center is bizarre. First, **Appellee** leveled that objection, and counsel is presumed to have a strategic reason for doing so. If that judgment is objectively reasonable, any ineffective assistance of counsel claim necessarily fails.

Oddly, the trial court concluded that there was a good reason to make the objection. The court believes that sustaining the objection "suggested to the

*(Footnote Continued Next Page)*

To reiterate, we are mindful that we are not reviewing the underlying weight question. That said, a mere recitation by the trial court that a grave injustice occurred would be an abuse of discretion if not backed up by concrete observations and facts. In *Widmer*, our Supreme Court determined that the trial judge improperly granted a new trial on weight grounds because its opinion "offer[ed] nothing more than its assessment of the credibility of the witnesses and lacks the necessary foundation for the required concomitant finding of a serious miscarriage of justice." *Widmer*, 744 A.2d at 754. That required additional finding of a serious miscarriage of justice is supported here. We are examining a cold record, and a transcript cannot convey the emotions and other cues that fact-finders rely upon in making credibility determinations. The trial court carefully explained its firsthand observations of the testimony, and stated that this case was the first time its conscience

---

jury that [E.A.] had 'made' J.K. go to the second … interview, calling J.K.'s credibility into question, but the jury was deprived of hearing J.K.'s true reason and was asked to assume that her reason was nefarious." Trial court opinion, 5/13/22 at 42. We fail to see why the jury's thinking that J.K. was forced to go to the interview by E.A. or acted nefariously would harm Appellee at all. It would certainly help Appellee if the jury thought that J.K. was an unwilling participant and disclosed the abuse only because that was what her mother expected. Indeed, that may well explain why Appellee objected. But, in any event, it was premature to write an opinion that announces an ineffective assistance of counsel claim would succeed if presented.

Relatedly, we agree with the Commonwealth that the trial court's conclusion that the burden was somehow shifted to Appellee to prove his innocence is manifestly incorrect. Moreover, the lack of corroborating testimony from any of the other household members is curious given the facts, but we cannot speculate as to the reasons why neither side called those witnesses.

had been shocked by a verdict. "Until now, we had yet to be presented with a case where our conscience was anywhere near our definition of 'shocked.'" Trial court opinion, 5/13/22 at 37.

As the **Widmer** Court stated, "One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice." **Widmer**, 744 A.2d at 753. Just as it would be rare for an appellate court to overturn the denial of a new trial on weight grounds, we must exercise great caution before overturning the grant of a new trial on weight grounds. The facts here are certainly unusual, and while we do not find that the testimony was so unreliable and/or contradictory that the verdict rested on pure conjecture as in **Karkaria**, **supra**, the trial court's explanation for why it found that the verdict shocked its conscience does not strike this Court as a capricious or arbitrary judgment, nor is it manifestly unreasonable. Its finding of a miscarriage of justice is supported by adequate reasoning. Accordingly, we find that the trial court did not abuse its discretion in determining that the weight of the evidence did not support the verdict.

Based on the foregoing, we reverse the trial court's May 13, 2022 order discharging Appellee from custody, affirm that portion of the order granting a new trial, and remand for further proceedings consistent with this opinion.

Order reversed in part and affirmed in part. Case remanded for a new trial. Jurisdiction relinquished.

Judge McLaughlin joins.

President Judge Emeritus Bender files a Concurring Opinion.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/5/2024